No. 67,778

ALETA BLUE; DONALD R. STEELE; KANSAS CREDIT UNION LEAGUE; CATHOLIC FAMILY FEDERAL CREDIT UNION; MID AMERICAN CREDIT UNION; BOEING WICHITA EMPLOYEES CREDIT UNION; ST. JOSEPH MEDICAL CREDIT UNION; and CREDIT UNION OF AMERICA, *Appellees,* v. BETTY MCBRIDE, Director of Division of Vehicles, Kansas Department of Revenue, and THE STATE OF KANSAS, *Appellants.*

(850 P.2d 852)

Opinion filed April 16, 1993.

*L. N. Collier*, special assistant attorney general, argued the cause and was on the brief for appellants.

*David G. Seely*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, and *Curtis A. Loub*, of Boyer, Donaldson & Stewart, of Wichita, argued the cause, and *Gerrit H. Wormhoudt*, of Fleeson, Gooing, Coulson & Kitch, and *Michael L. North*, of Boyer, Donaldson & Stewart, were with them on the briefs for appellees.

*Patrick R. Barnes*, of Scott, Quinlan & Hecht, of Topeka, was on the brief for *amicus curiae* Kansas Motor Car Dealers Association.

The opinion of the court was delivered by

McFARLAND, J.: This is an action by two individuals engaged in the automobile brokering business and six credit unions (who refer members interested in the purchase of new automobiles to automobile brokers) against the defendants Director of the Division of Vehicles of the Kansas Department of Revenue and the State of Kansas seeking: (1) a declaratory judgment that S.B. 486 (L. 1990, ch. 52) is unconstitutional and void; (2) temporary and permanent injunctions preventing the enforcement of S.B. 486; and (3) attorney fees and costs pursuant to 42 U.S.C. § 1988 (1988). The purpose of S.B. 486 was to eliminate the business of brokering new and used automobiles in the State of Kansas. The district court: (1) held S.B. 486 was violative of the First and Fourteenth Amendments to the Constitution of the United States and the corresponding provisions of the Kansas Constitution; (2) entered temporary and permanent injunctions against the en-

forcement of S.B. 486; and (3) awarded plaintiffs attorney fees and costs. The defendants appeal from said orders and judgments.

Not all automobile brokering businesses operate in precisely the same manner, but they share many of the same characteristics. A good starting point would be a rather detailed statement of how the individual plaintiffs herein operate their businesses.

## ALETA BLUE

Ms. Blue operates a business known as Signature Fleet and Leasing (Signature). Ms. Blue holds licenses as a new automobile broker, a used vehicle dealer, and a new car salesman. The latter license is through Hofmeier Chevrolet of Harper, Kansas, and covers Chevrolet, Oldsmobile, and Pontiac automobiles. Ms. Blue's husband holds a salesman's license through John North Ford of Emporia. Signature handles Dodge, Chrysler, Jeep, and Eagle vehicles through Ely Rush, a licensed salesman with Zeller Motor Company of Arkansas City. Additionally, Signature handles some imports by direct contact with their dealers. Signature's office is in Andover, Kansas. Its staff is Ms. Blue and a secretary. It has no inventory of automobiles, showroom, parts, or repair departments. Ms. Blue's husband has a full-time job not involved with Signature. His involvement with Ms. Blue's business is with some but not all of the Ford sales.

Ms. Blue has an arrangement with the dealers involved whereby the dealers will sell vehicles to Signature's customers on the basis of invoice price plus $100. The dealer pays Signature/Ms. Blue a fee or commission for each vehicle sold under the arrangement. Most of the sales involved come through referrals from area credit unions with whom Ms. Blue has arrangements. No fees or commissions are paid to the referring credit unions by Ms. Blue, the dealers, or credit union members who purchase vehicles after having been referred to Ms. Blue. The credit union's gain from the transaction involves only good will through offering a service to its members and profit from the purchase loan if the purchase is financed through the referring credit union. The credit unions have no agreements or contacts with the participating dealers.

The system operates in the following manner. The credit union offers the service (it may or may not advertise the service) that:

(1) members may avoid the hassle of negotiating a new car purchase with a dealer by utilizing the credit union's service; (2) all vehicles involved may be purchased at $100 over the manufacturer's invoice price; (3) information may be obtained on prices, options, colors, standard equipment, warranties, and availability of any Ford, Chevrolet, Chrysler, etc. vehicles; and (4) reasonable financing may be obtained through the credit union. If a credit union member desires the service or just wants information on vehicles, he or she is referred to Ms. Blue. Through a computer software program, Ms. Blue can provide information to the customer on any vehicle models in the program. If the customer decides to purchase a vehicle, Ms. Blue writes up the order on forms provided by the dealer involved (Hofmeier Chevrolet if it is a Chevrolet, Pontiac, or Oldsmobile, for example). The customer gives Ms. Blue a deposit made out to the dealer. If the dealer accepts the order, the dealer fills out all of the required papers for securing the title, odometer statement, warranty information manual, etc., the same as the dealer would do if the customer were dealing directly with the dealer. Delivery of the vehicle may occur at the Signature office, the customer's home, the dealership, or other agreed upon place.

## DONALD R. STEELE

Mr. Steele lives in the Wichita area. He is licensed as a new car salesman through Zeller Motor Company but transacts business with many dealers. Mr. Steele's wife is a licensed salesman with Hofmeier Chevrolet. His daughter holds a license through John North Ford. Each of these women has other full-time avocations or occupations. Their involvement in automobile sales is minimal and irregular. Until the day before trial herein, Mr. Steele operated his business from a desk located in the Mid-American Credit Union in Wichita. No rent was paid, although Mr. Steele paid his telephone expense. Nothing about the appearance of the operation indicated Mr. Steele was not a credit union employee. From the credit union Mr. Steele moved to rented quarters. Like Ms. Blue, virtually all of the transactions he was involved in came through credit union referrals. Mr. Steele has no showroom, parts, or repair facilities. Arrangements exist for the handling of trade-ins, but the details thereof are of

no particular significance herein. Services offered by the credit union and Mr. Steele, as well as the processing of orders, are essentially the same as outlined in our statements relative to Ms. Blue's operation.

In summary then, Ms. Blue and Mr. Steele receive referrals of potential new car buyers from credit unions. They serve as middlemen between the customer and the participating dealer on sales. Additionally, they provide information to prospective customers on a wide variety of vehicles manufactured in the United States. Other variations in the operation of the brokering business may exist, but the middleman role appears to be a constant and may be considered the primary characteristic of a broker.

The distribution and sales of new motor vehicles in Kansas is, as in most states, a highly regulated business. Persons and business entities engaged in virtually every aspect therein are required to be licensed whether they be manufacturers, distributors, factory representatives, distributor representatives, dealers, salesmen, etc. The Vehicle Dealers and Manufacturers Licensing Act (K.S.A. 8-2401 *et seq.*) (Act) is a detailed, all-encompassing Act covering such regulations. For the 12 years prior to 1990, the brokering of automobiles was permitted by the Act.

In 1990, S.B. 486 was introduced at the behest of the Kansas Motor Car Dealers' Association. The aim was the elimination of the automobile brokerage business. Extensive hearings were held where both proponents and opponents appeared. The bill was enacted into law to become effective on January 1, 1991. On November 5, 1990, the action herein was filed, challenging the constitutionality of this legislative enactment. The district court issued a temporary injunction maintaining the status quo and enjoining the enforcement of S.B. 486. Later, the district court held S.B. 486 to be constitutionally impermissible and thus void. The temporary injunction was made permanent and attorney fees and costs were awarded to the plaintiffs. The defendants appeal from said determinations.

Setting forth S.B. 486 herein presents something of a logistical problem. The bill amended numerous sections of the Act. Many of the sections amended are lengthy and, of necessity, a great

deal of unamended material is contained in the bill. This material has little or no bearing on the issues herein. Its inclusion would greatly lengthen the opinion without adding much to our discussion. Its elimination presents the pertinent amendments out of context and makes it rather difficult to relate them to the overall scheme of the regulatory act. We opt in favor of the latter approach. For the full text of S.B. 486, the reader is directed to L. 1990, ch. 52. The pertinent portions of S.B. 486 are as follows:

"Section 1. K.S.A. 1989 Supp. 8-2401 is hereby amended to read as follows: 8-2401. As used in this act, the following words and phrases shall have the meanings:

"(a) 'Vehicle dealer' means any person who: (1) For commission, money or other thing of value is engaged in the business of buying, selling or offering or attempting to negotiate a sale of an interest in vehicles; or (2) for commission, money or other thing of value is engaged in the business of buying, selling or offering or attempting to negotiate a sale of an interest in vehicles for other persons as an agent, middleman or negotiator; or (3) for commission, money or other thing of value is engaged in the business of bringing buyers and sellers of vehicles together; or (4) for commission, money or other thing of value is engaged in the business of buying, selling or offering or attempting to negotiate a sale of an interest in motor vehicles as an auction motor vehicle dealer as defined in (jj) . . . .

. . . .

"(ff) 'Broker' means any person who, for *a fee,* commission, money or, other thing of value, *valuable consideration or benefit, either directly or indirectly, arranges or offers to arrange a transaction involving the sale of a vehicle or mobile home, or* is engaged in the business of: (1) Selling or buying vehicles or mobile homes for other persons as an agent, middleman or negotiator; or (2) bringing buyers and sellers of vehicles or mobile homes together, but such term shall not include any person engaged in a business in which the acts described in this subsection are only incidentally performed *or which are performed or authorized within the requirements or scope of any other category of license, or not prohibited, in the manner authorized by the vehicle dealers' and manufacturers' licensing act.*

. . . .

"Sec. 2. K.S.A. 8-2402 is hereby amended to read as follows: 8-2402. It is hereby declared to be the public policy of this state to provide for fair and impartial regulation of those persons engaged in manufacturing, distributing or selling of vehicles or mobile homes. The provisions of this act which are applicable to such activities shall be administered in such a manner as will continue to promote fair dealing and honesty in the vehicle industry or the mobile home industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage. It

is further declared to be the policy of this state to protect the public interest in the purchase and trade of vehicles and mobile homes, so as to insure protection against irresponsible vendors and dishonest or fraudulent sales practices *and to assist, provide and secure a stable, efficient, enforceable and verifiable method for the distribution of vehicles to consumers in the state of Kansas and provide a system of tracking the flow of vehicles and their parts as well as preserving supporting services for consumers purchasing or otherwise acquiring vehicles and mobile homes.*

"Sec. 3. K.S.A. 1989 Supp. 8-2404 is hereby amended to read as follows: 8-2404. . . .

. . . .

"(i) If the director has reasonable cause to doubt the financial responsibility or the compliance by the applicant or licensee with the provisions of this act, the director may require the applicant or licensee to furnish and maintain a bond in such form, amount and with such sureties as the director approves, but such amount shall be not less than $5,000 nor more than $20,000, conditioned upon the applicant or licensee complying with the provisions of the statutes applicable to the licensee and as indemnity for any loss sustained by any person by reason of any act by the licensee constituting grounds for suspension or revocation of the license. Every applicant or licensee who is or applies to be a used vehicle dealer, *or* a new vehicle dealer or a broker dealer, except those selling only motorized bicycles and mobile homes, shall furnish and maintain a bond in such form, amount and with such sureties as the director approves, in the amount of $15,000, conditioned upon the applicant or licensee complying with the provisions of the statutes applicable to the licensee and as indemnity for any loss sustained by any person by reason of any act by the licensee in violation of any act which constitutes grounds for suspension or revocation of the license. . . .

. . . .

"(q) Any *vehicle* dealer selling, exchanging or transferring or causing to be sold, exchanged or transferred new vehicles or new mobile homes in this state must satisfactorily demonstrate to the director that such vehicle dealer or mobile home dealer has a bona fide franchise agreement or mobile home sales agreement with the first or second stage manufacturer or distributor of the vehicle or mobile home manufacturer, to sell, exchange or transfer the same or to cause to be sold, exchanged or transferred.

"*No person may engage in the business of buying, selling or exchanging new motor vehicles, either directly or indirectly, unless such person holds a license issued by the director for the make or makes of new motor vehicles being bought, sold or exchanged, or unless a person engaged in such activities is not required to be licensed or acts as an employee of a licensee and such acts are only incidentally performed. For the purposes of this section, engaged in the business of buying, selling or exchanging new motor vehicles, either directly or indirectly, includes: (1) Displaying new motor vehicles on a lot or showroom; (2) advertising new motor vehicles, unless*

the person's business primarily includes the business of broadcasting, printing, publishing or advertising for others in their own names; or (3) regularly or actively soliciting or referring buyers for new motor vehicles.

"(r) Any mobile home dealer selling, exchanging or transferring or causing to be sold, exchanged or transferred new mobile homes in this state must satisfactorily demonstrate to the director that such mobile home dealer has a bona fide franchise agreement or mobile home sales agreement with the first or second stage manufacturer or distributor of the mobile home manufacturer, to sell, exchange or transfer the same or to cause the same to be sold, exchanged or transferred.

"(s) No person may engage in the business of buying, selling or exchanging used motor vehicles, either directly or indirectly, unless such person holds a license issued by the director for used motor vehicles being bought, sold or exchanged, or unless a person engaged in such activities is not required to be licensed or acts as an employee of a licensee and such acts are only incidentally performed. For the purposes of this section, engaged in the business of buying, selling or exchanging used motor vehicles, either directly or indirectly, includes: Displaying used motor vehicles on a lot or showroom; (2) advertising used motor vehicles, unless the person's business primarily includes the business of broadcasting, printing, publishing or advertising for others in their own names; or (3) regularly or actively soliciting buyers for used motor vehicles.

"(r) (t) The director of vehicles shall publish a suitable Kansas vehicle or mobile home salesman's manual. Before a vehicle or mobile home salesman's license is issued, the applicant for an original license or renewal thereof shall be required to pass a written examination based upon information in the manual.

"(s) (u) No new license shall be issued nor any license renewed to any person to act as a salvage vehicle dealer until the division has received evidence of compliance with the junkyard and salvage control act as set forth in K.S.A. 68-2201 et seq. and amendments thereto.

"(v) On and after the effective date of this act, no person shall act as a broker in the advertising, buying or selling of any new or used motor vehicle. Nothing herein shall be construed to prohibit a person duly licensed under the requirements of this act from acting as a broker in buying or selling the following: (1) A mobile home or manufactured home; or (2) a recreational vehicle as defined by subsection (f) of K.S.A. 75-1212, and amendments thereto, when the recreational vehicle subject to sale or purchase is a used recreational vehicle which has been previously titled and independently owned by another person for a period of 45 days or more, or is a new or used recreational vehicle repossessed by a creditor holding security in such vehicle.

"(w) Nothing herein shall·be construed to prohibit a person not otherwise required to be licensed under this act from selling such person's own vehicle as an isolated and occasional sale."

## FOURTEENTH AMENDMENT

We turn now to the issues. The district court held that S.B. 486 violated the individual plaintiffs' due process and equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution by abolishing their automobile brokering businesses.

We must first establish the applicable scope of judicial review of the legislation. An appropriate starting point is *Williamson v. Lee Optical Co.*, 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461, *reh. denied* 349 U.S. 925 (1955). In *Williamson* it was stated:

"The District Court held unconstitutional portions of three sections of the Act [Okla. Stat. tit. 59, §§ 941-47 (1953 Supp.); 1953 Okla. Sess. Laws ch. 13, §§ 1-8]. First, it held invalid under the Due Process Clause of the Fourteenth Amendment the portions of § 2 which make it unlawful for any person not a licensed optometrist or ophthalmologist to fit lenses to a face or to duplicate or replace into frames lenses or other optical appliances, except upon written prescriptive authority of an Oklahoma licensed ophthalmologist or optometrist.

"An ophthalmologist is a duly licensed physician who specializes in the care of the eyes. An optometrist examines eyes for refractive error, recognizes (but does not treat) diseases of the eye, and fills prescriptions for eyeglasses. The optician is an artisan qualified to grind lenses, fill prescriptions, and fit frames.

"The effect of § 2 is to forbid the optician from fitting or duplicating lenses without a prescription from an ophthalmologist or optometrist. In practical effect, it means that no optician can fit old glasses into new frames or supply a lens, whether it be a new lens or one to duplicate a lost or broken lens, without a prescription. The District Court conceded that it was in the competence of the police power of a State to regulate the examination of the eyes. But it rebelled at the notion that a State could require a prescription from an optometrist or ophthalmologist 'to take old lenses and place them in new frames and then fit the completed spectacles to the *face* of the eyeglass wearer.' 120 F. Supp., at 135. It held that such a requirement was not 'reasonably and rationally related to the health and welfare of the people.' *Id.*, at 136. The court found that through mechanical devices and ordinary skills the optician could take a broken lens or a fragment thereof, measure its power, and reduce it to prescriptive terms. The court held that 'Although on this precise issue of duplication, the legislature in the instant regulation was dealing with a matter of public interest, the particular means chosen are neither reasonably necessary nor reasonably related to the end sought to be achieved.' *Id.*, at 137. It was, accordingly, the opinion of the court that this provision of the law violated the Due Process Clause by arbitrarily interfering with the optician's right to do business.

"We think the due process question is answered in principle by *Roschen v. Ward*, 279 US 337, [73 L.Ed. 722, 49 S.Ct. 336 (1929),] which upheld a New York statute making [it] unlawful to sell eyeglasses at retail in any store, unless a duly licensed physician or optometrist were in charge and in personal attendance. The Court said, '. . . wherever the requirements of the Act stop, there can be no doubt that the presence and superintendence of the specialist tend to diminish an evil.' *Id.*, at 339.

"The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement. It appears that in many cases the optician can easily supply the new frames or new lenses without reference to the old written prescription. It also appears that many written prescriptions contain no directive data in regard to fitting spectacles to the face. But in some cases the directions contained in the prescription are essential, if the glasses are to be fitted so as to correct the particular defects of vision or alleviate the eye condition. The legislature might have concluded that the frequency of occasions when a prescription is necessary was sufficient to justify this regulation of the fitting of eyeglasses. Likewise, when it is necessary to duplicate a lens, a written prescription may or may not be necessary. But the legislature might have concluded that one was needed often enough to require one in every case. Or the legislature may have concluded that eye examinations were so critical, not only for correction of vision but also for detection of latent ailments or diseases, that every change in frames and every duplication of a lens should be accompanied by a prescription from a medical expert. To be sure, the present law does not require a new examination of the eyes every time the frames are changed or the lenses duplicated. For if the old prescription is on file with the optician, he can go ahead and make the new fitting or duplicate the lenses. But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.

"The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions because they may be unwise, improvident, or out of harmony with a particular school of thought. See *Nebbia v. New York*, 291 U.S. 502[, 78 L.Ed. 940, 54 S.Ct. 505 (1934)]; *West Coast Hotel Co. v. Parrish*, 300 U.S. 379[, 81 L.Ed. 703, 57 S.Ct. 578 (1937)]; *Olsen v. Nebraska*, 313 U.S. 236[, 85 L.Ed. 1305, 61 S.Ct. 862 (1941)]; *Lincoln Union v. Northwestern Co.* 335 U.S. 525, 93 L.Ed. 212, 69 S.Ct. 251 (1949)]; *Daniel v. Family Ins. Co.* 336 U.S. 220[, 93 L.Ed. 632, 69 S.Ct. 550 (1949)]; *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421[, 96 L.Ed. 469, 72 S.Ct. 405 (1952)]. We emphasize again what Chief Justice Waite said in *Munn v. Illinois*, 94 U.S. 113, 134, [24 L.Ed. 77 (1877)] 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.'

"Secondly, the District Court held that it violated the Equal Protection Clause of the Fourteenth Amendment to subject opticians to this regulatory system and to exempt, as § 3 of the Act does, all sellers of ready-to-wear glasses.

"The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. Texas*, 310 U.S. 141[, 84 L.Ed. 1124, 60 S.Ct. 879]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners*, 294 U.S. 608[, 79 L.Ed. 1086, 55 S.Ct. 570]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A. F. of L. v. American Sash Co.*, 335 U.S. 538 [, 93 L.Ed. 222, 69 S.Ct. 258]. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here. For all this record shows, the ready-to-wear branch of this business may not loom large in Oklahoma or may present problems of regulation distinct from the other branch." 348 U.S. at 485-89.

A case of perhaps even greater significance is *Ferguson v. Skrupa*, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963), wherein the Court stated:

"In this case, properly here on appeal under 28 U.S.C. § 1253, we are asked to review the judgment of a three-judge District Court enjoining, as being in violation of the Due Process Clause of the Fourteenth Amendment, a Kansas statute making it a misdemeanor for any person to engage 'in the business of debt adjusting' except as an incident to 'the lawful practice of law in this state.' The statute defines 'debt adjusting' as 'the making of a contract, express, or implied with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business who shall for a consideration distribute the same among certain specified creditors in accordance with a plan agreed upon.'

"The complaint, filed by appellee Skrupa doing business as 'Credit Advisors,' alleged that Skrupa was engaged in the business of 'debt adjusting' as defined by the statute, that his business was a 'useful and desirable' one, that his business activities were not 'inherently immoral or dangerous' or in any way contrary to the public welfare, and that therefore the business could not be 'absolutely prohibited' by Kansas. The three-judge court heard evidence by Skrupa tending to show the usefulness and desirability of his business and evidence by the state officials tending to show that 'debt adjusting' lends itself to grave abuses against distressed debtors, particularly in the lower income brackets, and that these abuses are of such gravity that a number of States have strictly regulated 'debt adjusting' or prohibited it altogether. The court found that Skrupa's business did fall within the Act's [G.S. 1949, 21-2464 (1961 Supp.)] proscription and concluded, one judge

dissenting, that the Act was prohibitory, not regulatory, but that even if construed in part as regulatory it was an unreasonable regulation of a 'lawful business,' which the court held amounted to a violation of the Due Process Clause of the Fourteenth Amendment. The court accordingly enjoined enforcement of the statute.

"The only case discussed by the court below as support for its invalidation of the statute was *Commonwealth v. Stone*, 191 Pa. Super 117, 155 A.2d 453 (1959), in which the Superior Court of Pennsylvania struck down a statute almost identical to the Kansas act involved here. In *Stone* the Pennsylvania court held that the State could regulate, but could not prohibit, a 'legitimate' business. Finding debt adjusting, called 'budget planning' in the Pennsylvania statute, not to be 'against the public interest' and concluding that it could 'see no justification for such interference' with this business, the Pennsylvania court ruled that State's statute to be unconstitutional. In doing so, the Pennsylvania court relied heavily on *Adams v Tanner*, 244 U.S. 590[, 61 L.Ed. 1336, 37 S.Ct. 662] (1917), which held that the Due Process Clause forbids a State to prohibit a business which is 'useful' and not 'inherently immoral or dangerous to public welfare.'

"Both the District Court in the present case and the Pennsylvania court in *Stone* adopted the philosophy of *Adams v. Tanner*, and cases like it, that it is the province of courts to draw on their own views as to the morality, legitimacy, and usefulness of a particular business in order to decide whether a statute bears too heavily upon that business and by so doing violates due process. Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy. In this manner the Due Process Clause was used, for example, to nullify laws prescribing maximum hours for work in bakeries, *Lochner v. New York*, 198 U.S. 45[, 49 L.Ed. 937, 25 S.Ct. 539] (1905), outlawing 'yellow dog' contracts, *Coppage v. Kansas*, 236 U.S. 1[, 59 L.Ed. 441, 35 S.Ct. 240] (1915), setting minimum wages for women, *Adkins v. Children's Hospital*, 261 U.S. 525[, 67 L.Ed. 785, 43 S.Ct. 394] (1923), and fixing the weight of loaves of bread, *Jay Burns Baking Co. v. Bryan*, 264 U.S. 504[, 68 L.Ed. 813, 44 S.Ct. 412] (1924). This intrusion by the judiciary into the realm of legislative value judgments was strongly objected to at the time, particularly by Mr. Justice Holmes and Mr. Justice Brandeis. Dissenting from the Court's invalidating a state statute which regulated the resale price of theatre and other tickets, Mr. Justice Holmes said, 'I think the proper course is to recognize that a state legislature can do whatever it sees fit to do unless it is restrained by some express prohibition in the Constitution of the United States or of the State, and that Courts should be careful not to extend such prohibitions beyond their obvious meaning by reading into them conceptions of public policy that the particular Court may happen to entertain.'

"And in an earlier case he had emphasized that, 'The criterion of constitutionality is not whether we believe the law to be for the public good.'

"The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns*, and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, 'We are not concerned . . . with the wisdom, need, or appropriateness of the legislation.' Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to 'subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.' It is now settled that States 'have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.'

"In the face of our abandonment of the use of the 'vague contours' of the Due Process Clause to nullify laws which a majority of the Court believed to be economically unwise, reliance on *Adams v Tanner* is as mistaken as would be adherence to *Adkins v. Children's Hospital*, overruled by *West Coast Hotel Co. v. Parrish*, 300 U.S. 379[, 81 L.Ed. 703, 57 S.Ct. 578] (1937). Not only has the philosophy of *Adams* been abandoned, but also this Court almost 15 years ago expressly pointed to another opinion of this Court as having 'clearly undermined' *Adams*. We conclude that the Kansas Legislature was free to decide for itself that legislation was needed to deal with the business of debt adjusting. Unquestionably, there are arguments showing that the business of debt adjusting has social utility, but such arguments are properly addressed to the legislature, not to us. We refuse to sit as a 'superlegislature to weigh the wisdom of legislation,' and we emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' Nor are we able or willing to draw lines by calling a law 'prohibitory' or 'regulatory.' Whether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes, or some other is no concern of ours. The Kansas debt adjusting statute may be wise or unwise. But relief, if any be needed, lies not with us but with the body constituted to pass laws for the State of Kansas.

"Nor is the statute's exception of lawyers a denial of equal protection of the laws to nonlawyers. Statutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution. The business of debt adjusting gives rise to a relationship of trust in which the debt adjuster will, in a situation of insolvency, be marshalling assets in the manner of a proceeding in bankruptcy. The debt

adjuster's client may need advice as to the legality of the various claims against him, remedies existing under state laws governing debtor-creditor relationships, or provisions of the Bankruptcy Act—advice which a nonlawyer cannot lawfully give him. If the State of Kansas wants to limit debt adjusting to lawyers, the Equal Protection Clause does not forbid it." 372 U.S. at 726-33.

An excellent discussion and analysis of the United States Supreme Court's shift on Fourteenth Amendment challenges to economic legislation is set forth in 2 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure, 2nd § 15.4 (1992), as follows:

"**Post-1937 Decisions Regarding 'Economic and Social Welfare Legislation'.** The exact dimension of the Court's deference to legislative economic judgments remained unclear after [U.S. v.] *Carolene Products*[Co., 304 U.S. 144, 82 L. Ed. 1234, 58 S. Ct. 778 (1938)]. The Court had suggested that it may consider the validity of the proffered rational basis for economic legislation. Subsequent Court decisions, however, disclosed that the judicial deference to the legislature's economic regulations was virtually complete.

"In *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*[, 335 U.S. 525, 93 L. Ed. 212, 69 S. Ct. 251 (1949),] the Court upheld the constitutionality of a state's 'right-to-work' law. After noting the Court's rejection of the 'Allgeyer-Lochner-Adair-Coppage constitutional doctrine,' Justice Black stressed that the states have the authority to legislate against 'injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.'

"Six years later in *Williamson v. Lee Optical Co.* [348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955)] the Court rejected the due process and equal protection arguments that the appellees made against the validity of an Oklahoma statute that restricted the ability of opticians to fit or duplicate eyeglasses. Not only was the Court unable to find a specific constitutional prohibition that the Oklahoma measure violated, but the Court was willing to conceive of possible reasons for the enactment that would furnish a rational basis for the law. The *Williamson* opinion suggests that the Court will not only presume that a legislature had a reasonable basis for enacting a particular economic measure, but also will hypothesize reasons for the law's enactment if the legislature fails to state explicitly the reasons behind its judgment. Consequently, anyone attempting to argue for the invalidation of a legislative economic enactment may have to discredit the Court's conceived reasons for the legislature's actions as well as the arguments of those who support the measure. The Court's turnabout from the *Lochner* era became complete with the *Williamson* decision.

"Justice Black's opinion in *Ferguson v. Skrupa* [, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963),] provides an appropriate epilogue for the demise of economic substantive due process. In sustaining a Kansas law that

prohibited anyone from conducting the business of debt adjusting unless incident to the practice of law, the Court through Justice Black stated: '[W]e refuse to sit as a "superlegislature to weigh the wisdom of legislation". . . . Whether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes or some other is no concern of ours.' Justice Holmes's *Lochner* dissent had become the Court's standard.

"Another step in the Court's retreat from its position as guardian of the laissez faire concept of economics was taken when the Court decided that the equal protection clause did not guarantee that economic legislation would treat all businesses equally. In *Railway Express Agency v. New York* [, 336 U.S. 106, 93 L. Ed. 533, 69 S. Ct. 463 (1949),] the Court rejected a constitutional argument that a New York City ordinance violated the equal protection clause. The ordinance prevented owners of delivery vehicles from placing advertisements on the outside of their vehicles unless the advertisement was for the owner's business. The appellant contended that the municipal regulation violated the equal protection clause because the proffered rationale for the ordinance, to reduce distractions for vehicle drivers and pedestrians, did not comport with the ordinance's classification. As long as the classification scheme 'has relation to the purpose for which it is made and does not contain the kind of discrimination against which the equal protection clause affords protection' the Court will sustain the regulation against arguments based on equal protection analysis. Because the classification had an arguable relation to the perceived goal of the legislation, the Court found that the ordinance violated no constitutional proscription.

"*Morey v. Doud* [, 354 U.S. 457, 1 L. Ed. 2d 1485, 77 S. Ct. 1344 (1957),] is one of the rare instances in which the Supreme Court found that a law violated the equal protection rationality test. *Morey* would be overruled almost twenty years later. [See *City of New Orleans v. Dukes*, 427 U.S. 297, 306, 49 L.Ed. 2d 511, 96 S.Ct. 2513 (1976).] The Court's decision in *Morey*, and its later decision to overrule *Morey*, provide a useful background for consideration of the degree of deference that must be given to legislative rules or classifications in the area of economics or social welfare. The Court had decided several cases after *Railway Express Co.* that strongly suggested that it would defer to legislative judgment on economic matters even if those who opposed a business regulation raised equal protection arguments against the measure. In short, the Court had implied that it would not use the equal protection clause to void economic regulations. In *Morey v. Doud*, however, the Court invalidated an Illinois statute because it violated the appellees' right to equal protection under the law.

"The statute in *Morey* required currency exchanges to meet certain requirements before the State Auditor could issue a license that would allow the exchange to conduct its business. The law specifically exempted from its requirements those who issued United States Post Office, American Express Company, or Western Union Telegraph Company money orders. The Court recognized that the purpose behind the regulation was 'to afford the public *continuing* protection' in its dealing with currency exchange.

Moreover, the Court understood that the present characteristics of the American Express Company made unnecessary any regulation of the sale of that company's money orders. The Court, however, was concerned that the American Express Company would retain its exemption even if its present characteristics changed. In essence, the Act not only created advantages for a 'closed class' of sellers but also only had 'a remote relationship' between its purpose and its classification scheme. Consequently, the Court concluded that the Illinois law violated the equal protection clause because a majority of the justices believed that this closed class lacked even a rational basis.

"Finally, in *City of New Orleans v. Dukes* the Court declared that *Morey* was an erroneous decision and overruled it. The City of New Orleans had adopted an ordinance that prohibited pushcart vendors from selling their goods in the city's French Quarter. The law exempted from its prohibition those pushcart vendors who qualified under the ordinance's 'grandfather' clause. Only two vendors qualified, and the respondent, who did not qualify under the 'grandfather' clause, contended the ordinance violated the equal protection clause.

"The Court rejected the contention after noting that the ordinance was purely an economic regulation. The Court reminded the respondent that it consistently had deferred to legislative determinations as to the desirability of a particular statutory classification. Any reliance on *Morey v. Doud* as a basis to invalidate the ordinance was mistaken. The Court explicitly overruled *Morey* and summarized its reaction to the equal protection argument when it stated that 'the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'

"Although the Supreme Court has never totally rejected a judicial role in the review of economic and social welfare legislation, it is rare that any law or classification would be held to violate substantive due process or equal protection principles under the rationality standard. In a few cases the Court has been confronted with situations where a legislative classification subjected out-of-state persons to discriminatory taxation or where the state singled out a group, such as mentally retarded persons, for special burdens for no reason other than antipathy towards that group. In these cases the Court invalidated the legislation under the equal protection rationality standard because the state could assert no interest to support the legislation other than a desire to discriminate against the disfavored group. Such laws violate equal protection because the desire to discriminate cannot in itself supply a justification for discriminatory classifications.

. . . .

"We have come full circle with the concepts of substantive due process and equal protection in the area of general economic or social welfare legislation. Originally there was little active review of such legislation, because the judges realized that the federal courts should defer to the other branches of government unless laws were totally arbitrary deprivations of liberty. Slowly there emerged independent judicial control of all govern-

mental policies under the guise of enforcing the due process guarantee. Today, the justices have accepted the position that they are only to actively guard fundamental constitutional values and that they should allow other branches of government great latitude in dealing with issues of 'economics and social welfare' which do not touch upon these values." pp. 408-14.

The district court herein acknowledged *Ferguson v. Skrupa*, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963), but agreed with the plaintiffs that *Gilbert v. Matthews*, 186 Kan. 672, 352 P.2d 58 (1960), remained viable inasmuch as we had cited it in later cases. In *Gilbert* we held:

"While the police power is wide in its scope and gives the legislature broad power to enact laws to promote the health, morals, security and welfare of the people, and further, that a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law. (*Little v. Smith*, 124 Kan. 237, 257 Pac. 959 [1927].)

"When once a subject is found to be within the scope of the state's police power the only limitations upon the exercise of the power are that regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against the evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures necessary to accomplish its purpose. (*Schaake v. Dolley*, 85 Kan. 598, 118 Pac. 80 [1911]; and *State v. Consumers Warehouse Market*, [183 Kan. 502, 329 P.2d 638 (1958)])." 186 Kan. at 677-78.

The rather subtle difference between *Gilbert* and the cited federal cases is that, under *Gilbert*, the evil to be corrected must have reference in fact and the legislation must be fairly designed to protect the public against such evil. We conclude the reliance on *Gilbert* is misplaced and does not afford the judiciary greater latitude in review herein. In the later cases in which *Gilbert* is cited, no issue was apparently raised relative to *Gilbert* containing a different standard of review than that employed by the federal judiciary. In *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 613-14, 576 P.2d 221 (1978), we stated:

"We turn to the due process and equal protection arguments raised by defendant. In order to properly resolve these issues it is necessary to understand the distinction between these two constitutional concepts. In *Ross v. Moffitt*, 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437 [1974], the Court explained:

" '. . . "Due process" emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the

same situation may be treated. "Equal protection," on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. . . .' (p. 609.)

"The standard of review in a due process case has fluctuated in response to society's changing attitudes concerning the proper role of the judiciary in the examination of social and economic regulations imposed pursuant to the state's police power. In the past courts often struck down laws with which they disagreed on the basis that due process was violated. (See, *e.g., Tyson & Brother v. Banton*, 273 U.S. 418, 71 L. Ed. 718, 47 S. Ct. 426 [1927]; *Adkins v. Children's Hospital*, 261 U.S. 525, 67 L. Ed. 785, 43 S. Ct. 394 [1923]; *Coppage v. Kansas*, 236 U.S. 1, 59 L. Ed. 441, 35 S. Ct. 240 [1915]; *Adair v. United States*, 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 [1908]; *Lochner v. New York*, 198 U.S. 45, 49 L. Ed. 937, 25 S. Ct. 539 [1905].) This practice fell into disrepute, however, beginning with the case of *Nebbia v. New York*, 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505 [1934]. There the court retreated from its previous attitude and declared the test for due process to be whether the legislative means selected had a real and substantial relation to the objective sought. The rule has been restated in terms of whether the regulation is reasonable in relation to its subject and is adopted in the interest of the community. (*West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578 [1937], 108 A.L.R. 1330.) Courts can no longer sit as a 'super legislature' and throw out laws they feel may be unwise, improvident or inappropriate. (*Ferguson v. Skrupa*, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 [1963], 95 A.L.R.2d 1347; *Williamson v. Lee Optical Co.*, 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 [1955].) That view remains valid today. (See, *North Dakota Pharmacy Bd. v. Snyder's Stores*, 414 U.S. 156, 38 L. Ed. 2d 379, 94 S. Ct. 407 [1973]; *Dean v. Gadsden Times Publishing Corp.*, 412 U.S. 543, 37 L. Ed. 2d 137, 93 S. Ct. 2264 [1973]; *Griswold v. Connecticut*, 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 [1965].)"

Fourteenth Amendment challenges have been made in other jurisdictions to legislation which had the effect of eliminating automobile brokering.

Under scrutiny in *Detroit Automotive Purchasing Services v. Lee*, 463 F. Supp. 954 (D. Md. 1978), was a revision of a Maryland statute relative to the licensing of automobile salesmen which had the effect of eliminating plaintiff's brokerage business. The basis for the legislation was the protection of consumers from fraud and deception in new car sales. The court held:

"Even if the record gave the DAPS [Detroit Automotive Purchasing Services] broker a 'clean bill of health,' plaintiffs' burden under its substantive due process claim still would not be met. The question presented by plaintiffs' substantive due process challenge is not whether new vehicle brokers are indeed innocent of any injurious act which the state may legitimately

legislate against, but, rather, whether the brokers are so incapable of committing such injurious acts, that regulating their conduct would not rationally correct any existing evil. *See generally Ferguson v. Skrupa*, [372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963)]; *Olsen v. Nebraska*, 313 U.S. 236, 246-47, 61 S. Ct. 862, 85 L. Ed. 1305 (1941); *East Hartford Ed. Ass'n v. Bd. of Ed. Etc.*, 562 F.2d 838, 852 (2d Cir. 1977). The Due Process Clause does not prohibit states from anticipating and addressing problems which have yet to manifest themselves, as long as the problem is at least rationally conceivable. In *Olsen v. Nebraska*, the Supreme Court expressly affirmed this principle in upholding a Nebraska statute which fixed the maximum compensation which a private employment agency might collect. In view of the competition in the market for employment services and the sophisticated nature of the appellants' clientele, the appellants maintained, as the plaintiffs have argued in this case, that there is no need for protective legislation concerning their activities. The *Olsen* Court dismissed the argument, observing:

" 'We are not concerned, however, with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which "should be left where . . . it was left by the Constitution— to the states and to Congress." . . . *There is no necessity for the state to demonstrate before us that evils persist* despite the competition which attends the bargaining in this field.' [313 U.S. at 246, 61 S. Ct. at 865 (citation omitted) (emphasis supplied.)]

"With regard to the Maryland licensing provisions, the Court cannot conclude that the General Assembly acted irrationally in extending the licensing requirement for new vehicle salesmen to the so-called new vehicle broker. Given the complexity of the automobile and its expense as a commodity, it is not irrational to anticipate and address the occurrence of fraud and deception in automobile sales. Nothing plaintiffs have presented has shown new car brokers to be any less capable of dishonesty than new car salesmen. In addition, the availability of less restrictive measures, *i.e.*, House Bill 1759, has long ago ceased to be a relevant consideration in the context of a substantive due process challenge to economic legislation since the *Lochner, Coppage*, and *Adams* line of cases was abandoned in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937). Finally, the particular remedy chosen by the General Assembly, a system of licensing vehicle salesmen through licensed dealers, cannot be shown to be an irrational way of addressing the problem of consumer abuse in the sale of automobiles. To the extent that the licensed dealer provides added supervision of the vehicle salesman, the licensing provisions challenged may be a more effective regulation of the broker's conduct than the system of direct licensing and bonding proposed in House Bill 1759 and advocated by the plaintiffs. The evidence and the arguments offered by the plaintiffs at trial would be more compelling if they were addressed to the Maryland General Assembly rather than a federal district court. Whether or not it is effective legislation, the licensing scheme does not offend the Due Process

Clause of the Fourteenth Amendment, and plaintiffs' claim thereunder cannot be sustained.

. . . .

"Plaintiffs advance two theories for invalidating the Maryland licensing scheme under the Equal Protection Clause of the Fourteenth Amendment and an analogous doctrine reflected in Article 23 of the Maryland Declaration of Rights. First, plaintiffs contend that the challenged provisions discriminatorily subject new vehicle brokers to restrictive regulation. Second, plaintiffs argue that they are victims of selective enforcement of the licensing provisions, since the MVA rejected a DAPS proposal which was 'similar' to the accommodation which permits UBS [United Buying Service] to operate lawfully in the state.

"Unlike the situation encountered with respect to plaintiffs' due process claim, the relevant state and federal constitutional provisions regarding equal protection are afforded the same judicial construction. *See Governor v. Exxon Corp.*, 279 Md. at 438, n. 8, 370 A.2d at 1118, n. 8. Accordingly, doctrine applicable to the Equal Protection Clause of the Fourteenth Amendment is also applicable to interpretation of Article 23 of the Maryland Declaration of Rights.

"In reviewing legislative choices in the field of economic regulation, courts are no more willing to resort to equal protection doctrine than an analysis under due process. Unless a provision draws a classification which implicates fundamental personal rights or is based upon an inherently suspect distinction such as race, religion, or alienage, the classification will be upheld unless it can be shown that the classification is not rationally related to a legitimate state interest. *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976); *McGowan v. State of Maryland*, 366 U.S. 420, 425-26, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961); *Governor v. Exxon Corp*, 279 Md. at 439, 370 A.2d 1102; *Aero Motors v. Adm'r, M.V.A.*, 274 Md. at 574-79, 337 A.2d 685. Having determined that the challenged licensing scheme is rationally related to a legitimate state interest for the purpose of due process, the initial equal protection argument that the licensing requirement impermissibly discriminates against new vehicle brokers has no validity." 463 F. Supp. at 968-71.

In *State v. Miner*, 331 N.W.2d 683 (Iowa 1983), at issue was a statute which required a person engaged in the selling of used automobiles to be licensed as a used motor vehicle dealer. As Iowa law required dealers names to be listed in the chain of title and to maintain repair facilities, these two requirements effectively eliminated the brokering of automobiles. The purpose of the legislation was to protect consumers from fraud and deception. The court held:

"The fact that the licensing requirements may foreclose a certain method of buying and selling used vehicles does not impute to the legislature an

intent to enact an unworkable statute. The prohibition of a legitimate business has nothing to do with the outcome of this appeal. *See Chicago Title Insurance Co. v. Huff*, 256 N.W.2d 17, 23-25 (Iowa 1977) (prohibition of in-state sales of title insurance a reasonable exercise of state's police power). The legislature may prohibit any business deemed inimical to public welfare. *Id.* at 25.

"We conclude that the plain meaning of section 322.3(2) and regulation 10.1(4) requires defendant to be licensed as a dealer in order to engage in the retail sale of used motor vehicles. We next consider whether the application of the licensing requirement to defendant violates constitutional and statutory provisions.

"II. *Constitutional and statutory considerations.* Defendant makes use of the scatter gun approach to raise a number of constitutional and statutory issues. We find no constitutional or statutory provisions which preclude the application of the licensing requirements to defendant.

"A. Defendant claims that the licensing requirements deprive him of due process and equal protection under the federal and Iowa constitutions. U.S. Const. amend. XIV; Iowa Const. art. 1, § 9. Defendant made no attempt to obtain a dealer's license; his claims, therefore, are basically substantive due process claims in other guises.

"Because the federal and state constitutional provisions contain a similar guaranty, they are deemed identical in scope, import and purpose, and we will look to United States Supreme Court interpretations of the 14th Amendment due process provision for guidance. *Chicago Title Insurance Co.*, 256 N.W.2d at 23.

"The modern tendency has been to extend rather than contract police power regulation over economic endeavors. *City of New Orleans v. Dukes*, 427 U.S. 297, 303-04, 96 S.Ct. 2513, 2516-17, 49 L. Ed. 2d 511, 516-17 (1976); *Chicago Title Insurance Co.*, 256 N.W.2d at 24. Such regularly enacted statutes are given a strong presumption of constitutionality. *Id.* at 25. An economic regulation challenged on substantive due process grounds will not be overturned as long as 'there is an evil at hand for correction, and . . . it might be thought that the particular legislative measure was a rational way to correct it.' *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S. Ct. 461, 464, 99 L. Ed. 563, 572 (1955).

"The well-recognized evil addressed by section 322.3(2) and its regulations is the possibility of fraud and deception in the retail sale of new and used motor vehicles. There can be no dispute that the State may legislate to protect consumers from fraud and deception in the purchase of motor vehicles. *Detroit Automotive Purchasing Services, Inc. v. Lee*, 463 F.Supp. 954, 968 (D. Md. 1978); *see generally Ferguson v. Skrupa*, 372 U.S. 726, 730-31, 83 S. Ct. 1028, 1031-32, 10 L. Ed. 2d 93, 97-98 (1963); *State v. Hutchinson Ice Cream Co.*, 168 Iowa 1, 9, 147 N.W. 195, 198 (1914), *aff'd*, 242 U.S. 153, 37 S. Ct. 28, 61 L. Ed. 217 (1916). The problem posed is whether the use of police power was a rational and reasonable method of protecting consumers of motor vehicles.

. . . .

"Our function is not that of a super-legislature which weighs the wisdom of the legislation, *Detroit Automotive Purchasing Services*, 463 F. Supp. at 967; we look only to whether the means chosen by the State are rational and reasonably necessary to the accomplishment of the State's purpose. We hold that the inclusion of brokers of used cars within the licensing requirement meets this test.

"Brokers have not been singled out by this legislation. They have simply been included in the class of all other persons engaged in the business of inducing the sale of motor vehicles at retail. The fact that the licensing statute will effectively preclude brokering is not determinative. In order to protect consumers from fraud and deception in the sale of motor vehicles, the State may prohibit the operation of brokering through the requirement that a person licensed under chapter 322 take title to any vehicle offered for sale. *See Chicago Title Insurance Co.*, 256 N.W.2d at 24.

"Nor is the law rendered unconstitutional simply because the State, legislatively, could devise a separate licensing scheme for brokers. We do not believe that the availability of a less restrictive alternative is a relevant consideration in the context of a substantive due process challenge to economic legislation. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S. Ct. 578, 81 L. Ed. 703 (1937)." 331 N.W.2d at 688-89.

What then is the applicable standard of judicial review? We start with two general rules.

The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. *State v. Risjord*, 249 Kan. 497, Syl. ¶ 1, 819 P.2d 638 (1991).

The burden of proof is on the party challenging the constitutionality of the statute. *State v. Durrant*, 244 Kan. 522, 526, 769 P.2d 1174 (1989).

The specific rules for judicial review of a statute of economic regulation challenged on Fourteenth Amendment grounds may be stated as follows:

1. Courts do not substitute their social and economic beliefs for the judgment of the legislative bodies and are not concerned with the wisdom, need, or appropriateness of legislation. *Ferguson v. Skrupa*, 372 U.S. 726, 730, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963).

2. An economic regulation challenged on substantive due process grounds will not be overturned as long as there is an evil at hand for correction and it might be thought that the particular

legislative measure was a rational way to correct it. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955).

3. The due process clause does not prohibit states from anticipating and addressing problems which have yet to manifest themselves as long as the problem is at least rationally conceivable. *Detroit Automotive Purchasing Services v. Lee*, 463 F. Supp. 954 (D. Md. 1978).

4. For legislative classification in economic regulation to be violative of the equal protection clause of the Fourteenth Amendment, the classification must amount to an invidious discrimination. Or, put another way, unless a statutory classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, the constitutionality of statutory discrimination is presumed and the challenged classification will be upheld if rationally related to a State interest. *New Orleans v. Dukes*, 427 U.S. 297, 303, 49 L. Ed. 2d 511, 96 S. Ct. 2513 (1976).

With these rules in mind let us now look at the purpose of S.B. 486. Included therein is an amendment to K.S.A. 8-2402 (Ensley 1982) reiterated herein for convenience as follows:

"Sec. 2. K.S.A. 8-2402 is hereby amended to read as follows: 8-2402. It is hereby declared to be the public policy of this state to provide for fair and impartial regulation of those persons engaged in manufacturing, distributing or selling of vehicles or mobile homes. The provisions of this act which are applicable to such activities shall be administered in such a manner as will continue to promote fair dealing and honesty in the vehicle industry or the mobile home industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage. It is further declared to be the policy of this state to protect the public interest in the purchase and trade of vehicles and mobile homes, so as to insure protection against irresponsible vendors and dishonest or fraudulent sales practices *and to assist, provide and secure a stable, efficient, enforceable and verifiable method for the distribution of vehicles to consumers in the state of Kansas and provide a system of tracking the flow of vehicles and their parts as well as preserving supporting services for consumers purchasing or otherwise acquiring vehicles and mobile homes.*

One can only conclude that at least some of the amendments to the statute reflect the legislative concerns leading to the enactment of S.B. 486. This does not mean that the amended portion reflects the entire purpose of S.B. 486 as some of the new

concerns might already have been covered by the purposes stated in the unamended portion of the statute.

The legislative history reflects that there was considerable testimony at the hearings on the bill that the brokering of automobiles was a significant threat to the continued existence of the present system of distribution of new cars in Kansas through dealers. Automobile manufacturers, distributors, dealers, etc., are heavily regulated businesses. A new vehicle dealer is required to have a franchise from a manufacturer or distributor. Such is expensive to acquire. Additionally, the franchise agreement and state law require the new vehicle dealer to maintain an inventory of vehicles, a showroom, a parts department, and repair facilities. The dealer must have adequate facilities to contain these various functions. Obviously, a payroll must be met consistent with the size of the operation involved. All of this represents a large investment to the dealer. By franchise agreement and state law, the dealer is required to perform warranty and recall work on all vehicles of the manufacturer or manufacturers with whom it holds franchises—regardless of whether that dealership sold the vehicle involved.

By comparison, a broker operates with virtually no overhead in maintaining, or expenses in starting, his or her business. A desk, a couple of chairs, and a computer are about all that is absolutely required. There was testimony presented that the number of new car dealers had shrunk from 433 to 373 in the last four years and that almost 50 percent of Kansas counties now have two or less new car dealerships. Additionally, there was evidence that such merchandising giants as Sears Roebuck, Wal-Mart, and Amway were poised to enter the brokering business in Kansas.

There, additionally, was evidence that a demise in the number of dealerships harms consumers, as warranty work and recall work is done at dealerships. The dealerships also maintain inventories of spare parts which, if no longer available in particular areas, would work inconvenience on the consumer. Concern was also expressed that brokers tended to be "fly-by-night" operations which might well be unavailable to disgruntled customers. That portion of the amendment to K.S.A. 8-2402 (Ensley 1982), which speaks of "to assist, provide and secure a stable . . . method for

the distribution of vehicles to consumers in the state of Kansas . . . as well as preserving supporting services for consumers purchasing or otherwise acquiring vehicles and mobile homes" quite clearly is in response to concerns for the consumer problems which would arise from the closing of dealerships.

The amendment is also raising other purposes concerned with regulation of the field, as opposed to the well-being of dealerships, when it speaks of "enforceable and verifiable method for . . . distribution" and "provide a system of tracking the flow of vehicles and their parts." Exactly what lay behind these concerns is not as clear in the legislative history. There is no written summary of some of the testimony at the hearings. The possible brokering of out-of-state vehicles was mentioned as having the capability of creating problems for the consumer in conjunction with obtaining repairs. Concern was also expressed that the control exerted in the present system to insure accurate information about the product as relayed to the potential customer will be lost as the brokers are, in essence, on their own and they alone deal with customers in brokered sales. Thus, the customer may be misled.

This brings us to a sub-issue herein. The district court restricted the defendants to the legislative history in presenting evidence of the purpose and intent of the legislation. It excluded proffered testimony from the defendants on enforcement problems arising from the brokering of automobiles, and a report from an expert, Dr. George R. Schink, on "The Impacts of Brokering on the Motor Vehicle Market." The basis for these exclusions was that this precise material had not been presented to the legislature. We find this exclusion to be erroneous. We do not know all of the concerns the legislature had relative to brokering. Under the holding of *Williamson v. Lee Optical Co.*, 348 U.S. 483, previously discussed, the court is not limited to evidence shown to have been before the legislature in determining the "evils" the legislation was aimed at correcting.

It is clear the district court viewed S.B. 486 as merely legislation intended to protect the established system of the sales of motor vehicles against unwelcome intruders and was deemed to be an improper area of legislative endeavor. This is an overly simplistic approach.

A review of the record herein further reveals the district court relied too heavily on how the brokering business has been operated by the individual plaintiffs herein. The court pointed out these plaintiffs had not been shown to have operated in a manner that was injurious to their customers. The plaintiff brokers did not receive payments from customers in their own names; they had the dealers prepare all necessary title and warranty instruments; they dealt only with licensed Kansas dealers; and all vehicle deliveries were directly from the dealer to the customer. Such operation eliminates much of the risk of consumer fraud. However, such method of operation is not the only form the business may take. In determining the issue herein, we must consider brokering in general and what evils occur or may occur therein. See *Detroit Automotive Purchasing Services v. Lee*, 463 F. Supp. 954. Brokers can operate on a shoestring and easily fold their tents and vanish—leaving their customers holding the bag on undelivered vehicles, for which they have paid in whole or part, or on incomplete or false title or warranty papers, etc. Unscrupulous brokers could pocket rebates and cause mischief relative to ability to track vehicles and collect sales taxes thereon.

The legislature has long been involved with the establishment and regulation of a system for the sale and distribution of motor vehicles. Virtually every aspect of the industry is regulated—included therein are such matters as what services a dealer must provide to the location of the dealership. The Vehicle Dealers and Manufacturers Licensing Act requires licenses for virtually everybody associated therewith. K.S.A. 8-2414 and K.S.A. 8-2415 legislate on what would normally be purely contractual matters between the dealer and the manufacturer. The legislature has set up all-encompassing legislation on motor vehicle sales. It cannot be seriously disputed that free-ranging unregulated new automobile sales would contain the ingredients of a consumer disaster. Warranties under such circumstances could be rendered meaningless. Sales taxes and titles could be hopelessly skewed. Fraud on the consumer could become rampant. The legislative purpose for regulating this industry as set forth in K.S.A. 8-2402 has to be considered a valid legislative objective under the police power. The legislature has determined that brokering of automobiles threatens the system set forth in the Act and, although authorized

for 12 years, that it should be abolished. This perceived threat to the system and the proposed remedy was the subject of extensive hearings before the legislature. Both individual plaintiffs testified at such hearings. They lost in the legislature. The courts are being asked to sit as a superlegislature and overturn the legislature's action as violative of the Fourteenth Amendment. This we are not empowered to do. *Ferguson v. Skrupa*, 372 U.S. 726.

We conclude the plaintiffs have failed to carry their burden of proof that S.B. 486 is violative of the Fourteenth Amendment and the district court erred in holding otherwise.

As to the due process claim herein, we conclude as follows:

1. S.B. 486 is economic legislation whose purposes are set forth in section 2 thereof (amending K.S.A. 8-2402 [Ensley 1982]). Such purposes are an expression of legislative concerns over problems that exist or which may rationally be conceived to occur in the future in sales and distribution of automobiles in Kansas unless remedial action is taken.

2. The licensing of businesses involved in the sales and distribution of motor vehicles in Kansas and the protection of purchasers thereof is a proper area of economic regulation by the State.

3. The legislature has determined there is an evil at hand to be corrected or one that may arise if remedial action is not taken. S.B. 486 is remedial action aimed at remedying what were perceived to be problems existing or conceivably occurring in the future. The plaintiffs had the burden of proof that there was no evil for correction and that the legislative measure was not a rational way to correct it. This they have not done, and the district court erred in holding otherwise.

4. As for the equal protection arguments, there is no showing of invidious discrimination herein. There are no suspect classifications shown herein involving race, religion, gender, etc. This is purely an economic regulation aimed at eliminating brokering as an element in the system of the distribution and sales of automobiles in Kansas. Under such circumstances, the constitutionality thereof is presumed and must be upheld where, as here, the legislative classifications are rationally related to a state interest.

5. S.B. 486 is not violative of the Fourteenth Amendment in either of the two asserted grounds: due process or equal protection.

## FIRST AMENDMENT

For their next issue herein, defendants contend the district court erred in holding S.B. 486 was violative of all plaintiffs' First Amendment rights of free speech. We believe it is appropriate to consider this issue separately as it relates to the two categories of plaintiffs—individuals and credit unions. As for the individual plaintiffs, the issue may be resolved quite simply.

The United States Supreme Court has defined commercial speech as that which "propose[s] a commercial transaction." *Board of Trustees, State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473, 106 L. Ed. 2d 388, 109 S. Ct. (1989). Traditionally, the claim is asserted where some law or act attempts to restrict a business or profession from advertising its business. Cases include *Bates v. State Bar of Arizona*, 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691, *reh. denied* 434 U.S. 881 (1977) (attorney advertising); *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976) (prescription drug prices); *Bigelow v. Virginia*, 421 U.S. 809, 44 L. Ed. 2d 600, 95 S. Ct. 2222 (1975) (abortion service); and *Capital Broadcasting Company v. Mitchell*, 333 F. Supp. 582 (D.D.C. 1971) (cigarette advertisements). As stated in *Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 37 L. Ed. 2d 669, 93 S. Ct. 2553, *reh. denied* 414 U.S. 881 (1973): "Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." 413 U.S. at 389.

The main thrust of S.B. 486 is to abolish the business of automobile brokering. The restriction on the individual plaintiff's right of speech is incidental thereto. We have previously concluded that the abolition of automobile brokering contained in the Act is not constitutionally impermissible. Thus, the individual plaintiffs have no First Amendment claim.

The issue as it relates to the credit unions is more complex. As it relates to the manner in which the credit unions now operate—advertising that solicits members to inquire about the invoice plus $100 price for new cars, and, upon inquiry, referring such members to brokers—there is no problem because the brokerage business is no longer a legal activity. However, the credit unions contend S.B. 486 prevents them from giving out information on automobile pricing as a service to their members or referring any member directly to a dealer. They point to the portion of S.B. 486 that amends 8-2402(q) which provides:

"Any *vehicle* dealer selling, exchanging or transferring or causing to be sold, exchanged or transferred new vehicles ~~or new mobile homes~~ in this state must satisfactorily demonstrate to the director that such vehicle dealer ~~or mobile home dealer~~ has a bona fide franchise agreement ~~or mobile home sales agreement~~ with the first or second stage manufacturer or distributor of the vehicle ~~or mobile home manufacturer,~~ to sell, exchange or transfer the same or to cause to be sold, exchanged or transferred.

"*No person may engage in the business of buying, selling or exchanging new motor vehicles, either directly or indirectly, unless such person holds a license issued by the director for the make or makes of new motor vehicles being bought, sold or exchanged, or unless a person engaged in such activities is not required to be licensed or acts as an employee of a licensee and such acts are only incidentally performed. For the purposes of this section, engaged in the business of buying, selling or exchanging new motor vehicles, either directly or indirectly, includes: (1) Displaying new motor vehicles on a lot or showroom; (2) advertising new motor vehicles, unless the person's business primarily includes the business of broadcasting, printing, publishing or advertising for others in their own names; or (3) regularly or actively soliciting or referring buyers for new motor vehicles.* L. 1990 ch. 52, § 3.

Thus, they argue they would be required to have a dealer's license to advertise their service or refer a buyer. They cannot obtain such a license as they have no franchise agreements nor any inclination (and probably ability) to obtain one.

The defendants argue that S.B. 486 contains no such restriction. They urged the district court to make the following finding:

"67. The plaintiff credit unions are not licensed by the Motor Vehicle Division in the State of Kansas. Senate Bill No. 486 does not prohibit them from dealing directly with the dealerships they currently deal with indirectly via brokers. Senate Bill No. 486 would not prohibit them from referring vehicle customers directly to Zeller Motor Company, John North Ford and

Hofmeier Chevrolet. Senate Bill No. 486 only affects the manner in which the plaintiff credit unions must structure their activity."

The plaintiff credit unions are not in the business of buying and selling automobiles. They may sell repossessed vehicles, but that is not a factor herein. As they operate now (referring members to brokers) or as they might operate (referring members directly to dealers), they do not and would not be negotiating with prospective purchasers, handling sales, or participating in delivery. No finders fee, commission, or remuneration comes back to the credit union if a sale is made to a person referred to a broker. Presumably, the same would hold true if the referral was made directly to a dealer. The only benefits to the credit union are the intangible good will factor for providing a service to a member and normal loan income if the purchased vehicle is financed through the credit union. Financing through the credit union is not a requirement for obtaining the service. If S.B. 486 has the effect of precluding the credit unions from providing the informational service to customers and referring a member directly to a dealer, under the circumstances described herein, a serious First Amendment claim would be made as such restrictions exceed the anti-brokering purpose of the bill.

K.S.A. 8-2403 charges the defendant Director of Vehicles of the Department of Revenue with enforcement of the Vehicle Dealers and Manufacturers Licensing Act, of which S.B. 486 is a part.

In *Kansas Bd. of Regents v. Pittsburg State Univ. Chap. of K-NEA*, 233 Kan. 801, Syl. ¶ 3, 667 P.2d 306 (1983), we held: "The legal interpretation of a statute by an administrative agency charged with its enforcement is entitled to a great deal of judicial deference, following *Richardson v. St. Mary Hospital*, 6 Kan. App. 2d 238, 627 P.2d 1143, *rev. denied* 229 Kan. 671 (1981)."

In *Roberts Enterprises, Inc. v. Secretary of Transportation*, 237 Kan. 276, Syl. ¶ 1, 699 P.2d 479 (1985), we held: "In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done."

S.B. 486 is an amendment to a licensure act. The defendant director obviously construes S.B. 486 not to apply to plaintiff

credit unions except as they would deal with brokers or if they would endeavor to become brokers themselves. Is this a reasonable construction? We believe that it is. The thrust of the Act is to eliminate automobile brokering. This is the subject with which it deals. Its provisions are aimed at automobile brokering activities. Activities not involving brokering are not covered thereby.

Under such construction, the plaintiff credit unions have no First Amendment claim.

## KANSAS CONSTITUTION

The plaintiffs assert that S.B. 486, in addition to the previously discussed claims that it is violative of the First and Fourteenth Amendments to the Constitution of the United States, is also violative of the corresponding provisions of the Kansas Constitution. We have, on occasion, held that in particular areas the Kansas Constitution affords greater rights than does the United States Constitution. For example, see *Farley v. Engelken,* 241 Kan. 663, 671, 740 P.2d 1058 (1987). As to the issues raised herein, we conclude the Kansas Constitution affords no greater rights and, accordingly, the relevant provisions of the Kansas Constitution will not be discussed separately. Our previous determination relative to the constitutional claims is held to be dispositive of all such claims, whether asserted under the United States Constitution or the Kansas Constitution.

## ATTORNEY FEES

The district court awarded attorney fees to the plaintiffs under 42 U.S.C. § 1998 (1998). The defendants contend this was error. Inasmuch as we have upheld the constitutionality of the legislative enactment at issue herein, the plaintiffs are no longer prevailing parties entitled to such fees. The award of attorney fees must be reversed.

The judgment of the district court is reversed, and the permanent injunction issued therein is vacated.

SIX, J., concurs in the result.

ALLEGRUCCI, J., dissenting: The majority has no difficulty in finding that a rational basis exists for eliminating the automobile brokerage business. In my opinion, S.B. 486 (L. 1990, ch. 52) does not withstand a rational basis scrutiny and thus denies the

plaintiffs equal protection of the law. I therefore respectfully dissent.

I agree with the majority that the rational basis test is the appropriate level of scrutiny to be applied. The rational basis test requires that statutory classification be rationally related to a legitimate state interest. The majority, however, applies the test absent the words "rational" and "legitimate." I agree that this is a deferential standard of review, but it " 'is not a toothless one.' " *Mathews v. De Castro*, 429 U.S. 181, 185, 50 L. Ed. 2d 389, 97 S. Ct. 431 (1976) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510, 49 L. Ed. 2d 651, 96 S. Ct. 2755 [1976]).

In *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446-47, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985), Justice White, speaking for the Court, said:

"Our refusal to recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination. To withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose. This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner. The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. See *Zobel v. Williams*, 457 U.S. 55, 61-63 (1982); *United States Dept. of Agriculture v. Moreno*, 413 U.S. 528, 535 (1973). Furthermore, some objectives—such as 'a bare . . . desire to harm a politically unpopular group,' *id.*, at 534—are not legitimate state interests. See also *Zobel, supra*, at 63. Beyond that, the mentally retarded, like others, have and retain their substantive constitutional rights in addition to the right to be treated equally by the law."

The majority correctly notes that S.B. 486 was introduced at the "behest" of the Kansas Motor Car Dealers Association for the purpose of eliminating automobile brokers, which obviously would keep the brokers from competing with the car dealers. The majority does not find this objective to be a legitimate state interest, nor did the district court:

"The Defendants ask this Court to conclude that banning automobile brokers advances the legislative purposes. No evidence or argument has been offered to support this bald conclusion. Defendants have presented no explanation as to how the government interests are directly advanced by prohibiting brokers from advising credit union members of admittedly permissible offers. Defendants have offered no explanation as to how the

government interests are advanced by prohibiting brokers from informing willing consumers of the 'deals' available through licensed dealers.

"Senate Bill No. 486 forbids the individual Plaintiffs from bringing a buyer and seller together, even though that seller holds a license under the act. It prohibits the individual Plaintiffs from advertising new motor vehicles, even though the advertised transaction is effectuated and completed by a licensed salesperson and licensed new vehicle dealer. It prohibits the individual Plaintiffs from referring a buyer to a seller regularly or actively, even though that seller is a licensed salesperson.

"The State offers no argument or evidence that these prohibitions on individual Plaintiffs' speech advance any government interest. Nor is it apparent that these prohibitions on individual Plaintiffs' speech promote fair dealing and honesty in the industry; protect consumers against irresponsible vendors and dishonest or fraudulent sales practices; promote a reliable system for titling vehicles and tracking the flow of vehicles and parts; or preserve supporting services for Kansas new car purchasers."

Instead, the majority attempts to justify S.B. 486 based on the stated purpose for passing the original act. The majority speaks of the heavy burden placed on car dealers in being required to have a franchise from a manufacturer; to maintain an inventory of vehicles, a showroom, a parts department, and a repair facility; and to meet a payroll. And the final *coup de grace* is evidence that "such merchandising giants as Sears Roebuck, Wal-Mart, and Amway were poised to enter the brokering business in Kansas." These are not legitimate state interests which justify discriminating against automobile brokers. S.B. 486 is not rationally related to the purpose for passing the Vehicle Dealers and Manufacturers Licensing Act. The majority indirectly concedes that the legislative history of S.B. 486 does not evidence a rational basis for adopting it: "We do not know all of the concerns the legislature had relative to brokering. . . . [T]he court is not limited to evidence shown to have been before the legislature in determining the 'evils' the legislation was aimed at correcting." Clearly, however, the legislature could not have reasonably conceived to be true any of the purported facts which the majority now finds rational in justifying the adoption of S.B. 486.

In this regard, the district court found:

"33. There is nothing in the legislative history to indicate that automobile brokers present any threat to the interests set forth in K.S.A. 8-2402 that would require any measure more extreme than the enforcement of the licensing requirements and procedures which pre-dated Senate Bill No. 486. Nor have Defendants offered any competent evidence that abolishing automobile brokers would enhance enforcement of the existing licensing re-

quirements and prohibitions as they apply to others involved in the automobile distribution business.

"34. The Defendants' arguments concerning the police power objectives of Senate Bill No. 486 are not persuasive.

"First, they argue that Plaintiffs do not appear in the chain of title. The significance of this argument becomes apparent when one recognizes that the licensed automobile salesmen (and the publishers who may advertise what brokers now may not communicate under Senate Bill No. 486) do not appear in the chain of title. There is simply no support in the record for Defendants' assertion Senate Bill No. 486 would result in 'anyone having to do with the sale or transfer of a vehicle' appearing in the chain of title.

"At the risk of being simplistic, it must be emphasized that every car begins at the same place: the manufacturer. Every new car that enters Kansas must go from a manufacturer to a licensed dealer who enjoys a franchise from that manufacturer. Finally, every new car purchased with the assistance of Plaintiffs came to the consumer from a licensed dealer who completed the manufacturer's statement of origin, the odometer statement, the warranty information, and the sales tax receipt.

"The record does not contain any competent evidence to warrant the conclusion that the abolition of brokers' activities is reasonably necessary to preserve the Kansas system for titling or tracing automobiles.

. . . .

"The Defendants' complaints about the 'fly-by-night' nature of some automobile brokers can all be answered by the provisions which pre-existed Senate Bill No. 486. As the Attorney General noted in Opinion No. 90-22 (March 2, 1990), brokers must maintain an established place of business; must supply information at the Director's request to obtain a new or renewed license, such information relating to the broker's solvency or 'other pertinent matter commensurate with the safeguarding of the public interest'; and must maintain a bond of $15,000.00.

"The real complaint about the effect of automobile brokers seems to be that their activities permit some licensed dealers to sell too many automobiles, and that the consumer may look to another licensed franchise dealer to perform the less-profitable warranty work. This complaint arises, not because of the automobile brokers, but because some dealers have been willing to offer $100.00 over factory invoice to credit union members, while others have not been willing to do so. This risk to automobile dealers will continue so long as licensed·dealers can make such special offers, those offers are communicated to the public—even by those in the business of 'advertising for others in their own name'; consumers find those offers attractive; and, as the Attorney General noted, manufacturers require their franchisees to do warranty work without regard to where the vehicle was purchased."

The majority acknowledges that

"plaintiffs had not been shown to have operated in a manner that was injurious to their customers. The plaintiff brokers did not receive payments from customers in their own names; they had the dealers prepare all nec-

essary title and warranty instruments; they dealt only with licensed Kansas dealers; and all vehicle deliveries were directly from the dealer to the customer."

The majority, however, is concerned about "brokering in general and what evils occur or may occur therein" and "perceived threats" to the system. Unsubstantiated evils and "perceived threats" do not rationally justify the elimination of automobile brokers. Nor can I accept, as the majority does, that S.B. 486 was adopted to forestall a "consumer disaster" which would render warranties meaningless, hopelessly skew sales taxes and titles, and allow fraud to run rampant. S.B. 486 could not rationally have been intended to prevent any one of these abuses.

I agree with the district court that by any standard of scrutiny, S.B. 486 violates plaintiffs' right to equal protection under the law. I would affirm the district court.

ABBOTT and DAVIS, JJ., join the foregoing dissenting opinion.