**AUTOMAXX, INC., Plaintiff,**

**v.**

**Dan MORALES, in his capacity as Attorney General of the State of Texas, Brett Bray, in his official capacity as Executive Director of the Motor Vehicle Division of the Texas Department of Transportation, Carol Kent, in her official capacity as Assistant Director of the Motor Vehicle Division—Enforcement of the Texas Department of Transportation, Defendants.**

**Civ. A. No. H-94-4282.**

United States District Court,
S.D. Texas,
Houston Division.

Nov. 7, 1995.

Jack R. Bailey, Houston, TX, for plaintiff.

Edwin N. Horne, Austin, TX, John W. Owens, Houston, TX, Douglas Fraser, Asst. Atty. Gen., Natural Resources Div., Austin, TX, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HITTNER, District Judge.

This case was tried to the court on March 9, 1995. Based on the evidence, the post-trial submissions, and the applicable law, the Court enters the following as its findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52.

In December, 1994, AutoMaxx, Inc. ("AutoMaxx") filed suit against the State of Texas and several state employees (collectively, "State"). AutoMaxx is seeking a declaratory judgment that section 5.03 of the Texas Motor Vehicle Commission Code is unconstitutional. AutoMaxx's specific contentions are that the statute violates the First Amendment, the Due Process Clause, and the Equal Protection Clause of United States Constitution. In addition, AutoMaxx seeks damages under 42 U.S.C. § 1983.

### The Anti–Brokering Statute.

In 1971 the Texas legislature enacted the Texas Motor Vehicle Commission Code ("TMVCC"). Tex.Rev.Civ.Stat.Ann. art. 4413(36) §§ 1.01 et seq. (Vernon 1976 & Supp.1995).[1] The legislature's stated purpose in enacting the TMVCC was to "provide for compliance with manufacturer's warranties, and to prevent frauds, unfair practices, discriminations, impositions, and other abuses of [Texas] citizens." TMVCC § 1.02. In 1979 the TMVCC was amended to add section 5.03, the anti-brokering statute.[2] Section 5.03 provides that "[a] person may not act as, offer to act as, or hold itself out to be, a broker." TMVCC § 5.03. Section 1.03(10) of the Code defines a broker as a person who:

for a fee, commission, or other valuable consideration, arranges or offers to arrange a transaction involving the sale, for purposes other than resale, of a new motor vehicle, and who is not:

(A) a dealer or bona fide employee of a dealer when acting on behalf of a dealer;

(B) a representative or bona fide employee of a representative when acting on behalf of a representative;

(C) a distributor or bona fide employee of a distributor when acting on behalf of a distributor; or

(D) at any point in the transaction the bona fide owner of the vehicle involved in the transaction.

Violators of the anti-brokering provision are subject to substantial penalties of up to $10,-000.00 per day, per violation. TMVCC § 6.01(a).

### AutoMaxx's Operation.

AutoMaxx is a corporation in the business of brokering sales of new cars. AutoMaxx acts as middleman between new car dealers and credit unions and their members. AutoMaxx solicits new car dealers within a given market area to participate in its brokering plan. Each participating dealer establishes its own prices, expressed as a maximum amount of dollars over dealer invoice. The dealers designate salespeople who are authorized to offer the special prices and deal with credit union members participating in the plan.

AutoMaxx provides participating credit unions with a list of the participating dealers,

---

1. See Acts 1971, 62nd Leg., p. 89, ch. 51, § 1, eff. April 7, 1971.

2. Acts 1979, 66th Leg., p. 1732, ch. 709, § 24, eff. Sept. 1, 1979; amended by Acts 1989, 71st Leg., ch. 1130, § 25, eff. June 16, 1989.

their telephone numbers, addresses, names of designated salespeople, and the vehicle prices. The credit unions publish the information and offer their members financing to purchase the vehicles at the special prices. Most credit union members obtain pre-approved credit from their credit union before visiting the dealer. As part of the plan, the dealers agree to refrain from persuading credit union members to finance their purchase through the dealer rather than the credit union.

AutoMaxx is paid $100 by the dealer for each vehicle sold through the AutoMaxx plan. AutoMaxx does not purchase the vehicles or obtain title to the vehicles sold. AutoMaxx does not maintain any service or repair facilities, and does not display any of the vehicles for sale.

AutoMaxx also provides services directly to credit union members. For example, AutoMaxx offers access to the dealer price information by telephone. AutoMaxx audits transactions made under its plan to ensure compliance with the quoted maximum prices. It provides free information to credit union members regarding dealer pricing practices and financing arrangements, and conducts seminars aimed at educating consumers about the car buying process.

AutoMaxx began operation in 1988. In 1991 the Motor Vehicle Division of the Texas Department of Transportation investigated AutoMaxx and concluded that AutoMaxx did not violate the anti-brokering statute. In 1994 the Motor Vehicle Division investigated AutoMaxx again. Although AutoMaxx had made no substantial changes in its business practices, the second investigation found AutoMaxx in violation of the statute.

In December 1994, the Motor Vehicle Division informed AutoMaxx that a complaint would be filed the following month alleging violation of the anti-brokering statute. The dealers and credit unions participating in the AutoMaxx plan were given notice that any parties still doing business with AutoMaxx at that time would be named as respondents in the complaint. A large number of dealers and credit unions withdrew from the plan and AutoMaxx ceased to do business. AutoMaxx responded by filing suit.[3]

### Regulation of Speech or Conduct?

■ AutoMaxx contends that the anti-brokering statute is an impermissible regulation of speech. The State argues that the challenged law does not regulate speech at all but instead is a valid economic regulation. Before addressing the specific constitutional challenges to the law, the Court must determine which is the better characterization of the anti-brokering statute.

Brokering, as defined by the anti-brokering statute, comprises three elements: (1) "arrang[ing] or offer[ing] to arrange a transaction involving the sale, for purposes other than resale, of a new motor vehicle;" (2) accepting valuable consideration for arranging the transaction; and (3) that the person arranging the sale is not licensed by the State.[4] TMVCC § 1.03(10). The activity targeted by this statute is the act of selling or arranging the sale of an automobile. The statute does not ban speech, it bans the commercial transaction of receiving a fee for the sale of an automobile. Although speech may be a necessary component of a brokering as defined, it is subordinate to the principle activity regulated by the law.[5] Accordingly, the anti-brokering statute is properly characterized, not as a ban on speech, but rather as an economic regulation well within

---

**3.** By agreement, the State agreed not to prosecute AutoMaxx under the anti-brokering statute during the pendency of this action.

**4.** In other words, the party arranging the transaction is not a dealer, representative, distributor, bona fide employee of a dealer, representative or distributor, or the owner of the vehicle at any point in the transaction.

**5.** Compare for example, a regulation banning direct mail solicitation to the anti-brokering provision at issue here. The latter regulation pres-

ents a comprehensive prohibition on an economic activity. While speech does play a part in successfully brokering a car sale, the key is that an economic transaction was consummated—a transaction which the State deems necessary to regulate. In contrast, a regulation which prohibits solicitation effectively severs the speech element from the commercial conduct connected to the speech. In this situation, the state's ban is focussed on speech rather than a commercial transaction which incidentally involves speech.

the power of the State to enact. *E.g. Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978) (stating, "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity").

The Substantive Due Process Challenge.

■ AutoMaxx alleges that the anti-brokering statute is a violation of its substantive due process rights. Since the statute is an economic regulation, the court is to review the statute solely to determine whether it has a reasonable relation to a valid legislative purpose, and whether it is arbitrary or discriminatory. *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 398, 57 S.Ct. 578, 585, 81 L.Ed. 703 (1937). The framework under which this analysis is made is outlined below.

■ First, it is the role of legislatures, not courts, to decide on the wisdom, need and appropriateness of legislation. *Ferguson v. Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963). The courts may not "substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Id.* at 730, 83 S.Ct. at 1031. Second, an economic regulation will not be struck down on substantive due process grounds as long as "there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). Third, when reviewing the rationality of a particular regulatory scheme, the court may hypothesize what the legislature "might have concluded" in regard to the need for the regulation and its likely effects. *Id.* at 487. Finally, the legislature may anticipate and address problems which have not yet manifested themselves, so long as the problem is at least rationally conceivable. *Detroit Automotive Purchasing Servs. v. Lee,* 463 F.Supp. 954, 968 (D.Md.1978) (citing *Olsen v. Nebraska,* 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305 (1941)); *Blue v. McBride,* 252 Kan. 894, 850 P.2d 852, 870 (1993). Guided by these principles, the Court finds that the anti-brokering statute satisfies the requirements of substantive due process.

The sale and distribution of new cars is a highly regulated field in Texas, as it is in most states. The major players in this industry—manufacturers, distributors, dealers, and representatives—are all subject to extensive licensing and regulation. The anti-brokering statute at issue is another component in this overall scheme.

The Code states that the purpose of the overall licensing scheme is "to provide for compliance with manufacturer's warranties and to prevent fraud, unfair practices, discriminations, impositions, and other abuses of our citizens." TMVCC § 1.02. Additionally, the State contends that the anti-brokering statute guards against inflated prices for consumers, a lack of recourse through brokers for warranty service and recall adjustments, and the difficulty of locating fly-by-night brokers who commit fraud. The court has no difficulty finding that these are legitimate and substantial interests.

The anti-brokering statute pursues the goal of providing for compliance with manufacturers' warranties by allowing only licensed dealers to sell new vehicles, and regulating dealers and their relationships with manufacturers, distributors, and representatives. *See* TMVCC §§ 4.01–5.04. Dealers must provide information regarding their "financial resources, business integrity, business ability and experience, ... physical facilities for sales and service, parts and accessories inventory, ... and other factors the Commission considers necessary to determine an applicant's qualifications to adequately serve the motoring public." TMVCC § 4.02(a). Manufacturers, distributors, and representatives must meet similar requirements demonstrating their ability to serve dealers. *See* TMVCC § 4.03(a).

The State argues that brokers can sell vehicles at a lower cost than licensed dealers because they have lower overhead costs. Thus consumers' recourse to dealers may suffer because brokers may drive franchised dealers out of business. This is a particular concern in rural areas where brokers may undercut local dealers by offering lower prices on vehicles sourced from high volume city dealerships. The TMVCC places the

primary burden of warranty service upon dealers, and uses the licensing provisions to ensure that dealers are in a position to carry out that service. It is not unreasonable for the State to protect dealers from competition to ensure their continued existence so that the public will have access to warranty service.

The anti-brokering statute is also designed to guard against inflated prices for consumers. The State presented testimony that some consumers may pay more for a new vehicle purchased through a broker. For example, there was evidence that a dealer may simply recoup the broker's fee by adding it to the sales price of the vehicle. And while the Federal Trade Commission may believe that an anti-brokering statute could reduce competition and deny consumers savings that they could realize by using a broker, the court will not strike down an economic regulation merely because it "may be unwise, improvident or out of harmony with a particular school of thought." *Williamson*, 348 U.S. at 488, 75 S.Ct. at 464.

The difficulty of locating fly-by-night brokers who commit frauds is also asserted by the State as a goal of the anti-brokering statute. An automobile is a complex, expensive and highly mobile commodity. *See Detroit Automotive Purchasing*, 463 F.Supp. at 969. The opportunity for fraud is clearly present in the sale of new vehicles. As noted above, the Motor Vehicle Code places stringent requirements on all parties involved in the sale and distribution of new vehicles. The large financial investment required to become a new vehicle dealer encourages stability and longevity of the dealership. It is reasonable for the State legislature to have concluded that the lower investment required to become a broker makes it easier for brokers to liquidate their business and avoid apprehension after committing a fraud.

The fact that the State has not shown that AutoMaxx committed any of the abuses that the statute is designed to prevent is not dispositive. The court's focus should not be how the individual plaintiff operated its business. AutoMaxx's method of operation is not the only form that a broker's business may take. "In determin-

ing the issue herein, we must consider brokering in general and what evils occur or may occur therein." *Blue v. McBride*, 252 Kan. 894, 850 P.2d 852, 871 (1993). The question is whether "brokers are so incapable of committing such injurious acts, that regulating their conduct would not rationally correct an existing evil." *Detroit Automotive Purchasing*, 463 F.Supp. at 968. AutoMaxx has not shown that the purposes of the anti-brokering statute are not legitimate, or that the statute does not have a reasonable relation to those purposes. The statute thus satisfies the substantive due process requirements of the Fourteenth Amendment.

The Due Process Vagueness Challenge.

AutoMaxx also contends that the anti-brokering statute is unconstitutionally ambiguous and vague. To sustain its challenge, AutoMaxx must carry a heavy burden. An economic regulation is subject to a more lenient vagueness test,

> because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (footnotes omitted).

However, an additional consideration warrants heightened scrutiny in this case. The substantial penalties available for violation of the anti-brokering statute give it a "quasi-criminal" character that requires a stricter test. *Id.* at 498–99, 102 S.Ct. at 1193–94. Nevertheless, even under a stricter standard the statute passes muster.

The anti-brokering statute defines a broker as anyone who, "for a fee, commission, or other valuable consideration, arranges or offers to arrange a transaction involving the sale, for purposes other than resale, of a new motor vehicle," and who is not a dealer, representative, distributor, employee of a

dealer, representative, distributor, or the vehicle's owner. TMVCC § 1.03(10). Auto-Maxx has not pointed to a single word or phrase that it claims is ambiguous or vague. Instead, AutoMaxx relies on the Motor Vehicle Division's inconsistent application of the statute as evidence that the statute is unconstitutional.

■ However, "the principal inquiry is whether the law affords fair warning of what is proscribed." *Village of Hoffman Estates,* 455 U.S. at 503, 102 S.Ct. at 1195–96. Under this test, AutoMaxx's challenge must fail. AutoMaxx's activities fall squarely within the definition of brokering in the Code. Auto-Maxx was aware of the statute from at least 1991 when it was first investigated. The Motor Vehicle Division's decision not to proceed against AutoMaxx in 1991 does not render the statute ambiguous or vague. Auto-Maxx is in effect arguing that any failure to prosecute an open violation of a law will render that law vague. This argument is without merit.

AutoMaxx next argues that the Motor Vehicle Division considers various "other elements" not specified in the statute to determine if a party's activities constitute brokering. The language of the anti-brokering statute is broad. The effect of considering these "other elements" before bringing an enforcement action is to narrow the statute's scope. Giving the statute a narrow construction does not to make the statute vague.

The Equal Protection Challenge.

■ The Equal Protection clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 1. The Equal Protection clause does not forbid state legislatures from discriminating between classes of persons—the clause only requires that similarly situated persons be treated alike. *Nordlinger v. Hahn,* 505 U.S. 1, 8–10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).

■ When analyzing a statute drawing a distinction between classes of persons, the standard of review depends upon the nature of the classification. Unless a statute creates a classification that is based on an inherently suspect distinction or jeopardizes fundamental personal rights, the classification need only be rationally related to a legitimate state interest. *Id.; New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). The types of inherently suspect distinctions that warrant heightened review are those based on race, religion, gender or alienage. *Id.* Moreover, a classification must amount to "invidious discrimination" to violate the Equal Protection clause. *Id.*

■ The anti-brokering statute creates a class of persons who may broker new vehicles and a class of persons who may not. These two classes are not similarly situated in respect of the brokering of new vehicles. Dealers, representatives, distributors, the employees of dealers, representatives and distributors, and the owner of the vehicle being offered for sale, may all lawfully "broker" a new vehicle. Dealers, representatives, and distributors are persons who have demonstrated their ability to meet the needs of new vehicle purchasers. They are subject to stringent licensing requirements designed to ensure that they possess the financial resources, business integrity, and physical facilities required to service the needs of the public. Their large investment provides some guarantee that they will behave responsibly and lawfully to protect that investment. The class excluded from brokering consists of persons who have not demonstrated their ability to meet the public's needs. They have no large investment to protect and may reasonably be considered to pose a greater risk of committing fraud and abuse.

The class permitted to broker new vehicles also includes the owner of the vehicle being offered for sale. Only a licensed dealer may buy new vehicles for resale, so this provision represents a de minimis exception to allow those who are not in the business of selling new vehicles to arrange for the sale of new vehicles they own. It is not unreasonable for the legislature to have concluded that vehicle owners present a lesser risk of fraud and abuse than non-owners.

The anti-brokering statute deals with classes who are not similarly situated with

402

respect to the brokering of new vehicles. Because the statute's classification is not based on race, gender, alienage, religion, or national origin, and it does not jeopardize fundamental personal rights, it need only bear a rational relation to the interests underlying the statute. Although AutoMaxx contends that the statute impinges upon its fundamental rights by restricting its commercial speech, the court finds this argument unconvincing. Any restriction on Auto-Maxx's speech is merely incidental to the statute's regulation of an economic activity. Because the anti-brokering statute's classification scheme represents a reasonable method of pursuing a legitimate state objective, it does not violate the Equal Protection clause.

### The First Amendment Challenge.

Having found the anti-brokering statute to be a valid economic regulation, the Court must now determine the proper level of scrutiny for reviewing the incidental aspect of the law that regulates speech. The speech component of a brokering transaction is clearly commercial speech. That is, the speech is "expression related solely to the economic interests of the speaker and its audience," or, more narrowly, it "propos[es] a commercial transaction." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 561–62, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). Accordingly, the court should apply the intermediate standard of review set out in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[6]

Under this test, the first inquiry for the court is whether the speech at issue relates to an illegal activity or is misleading. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351 (stating, "for commercial speech to come within [the First Amendment], it at least must concern lawful activity....") (citing *Pittsburgh Press Co. v. Human Rel.*

*Comm'n*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669, *reh'g denied*, 414 U.S. 881, 94 S.Ct. 30, 38 L.Ed.2d 128 (1973)). If the State may constitutionally prohibit an activity, it may also prohibit commercial speech relating to that activity. In the instant case, if the State's regulation of new vehicle brokering is otherwise constitutional, then the resulting restriction on commercial speech of those not permitted to broker new vehicles will not render the statute unconstitutional. Because the anti-brokering statute passes muster under the Due Process and Equal Protection clauses, the First Amendment challenge must fail.

### The Section 1983 Claim.

Finally, as the anti-brokering statute is constitutional, the section 1983 claim is without merit.

Based on the foregoing, the Court

ORDERS that plaintiff AutoMaxx take nothing from defendants.

---

**6.** AutoMaxx contends that the court should apply the strict scrutiny test of *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). However, *R.A.V.* dealt with a content-based restriction on speech. The anti-brokering statute at issue in the present case is not content-based. The statute is aimed at regulating the business of brokering, not the speech of brokers. The statute does not proscribe what a broker may or may not say—it makes the business of brokering unlawful, and thus makes *any* conduct or speech made in furtherance of brokering unlawful.

Furthermore, the Supreme Court recently affirmed the proposition that commercial speech relating to unlawful activity may be freely regulated in *Florida Bar v. Went For It, Inc.*, —— U.S. ——, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995).